IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


INTREPID POTASH-NEW MEXICO, LLC,

       Plaintiff,

v.                                  Civil No. 09-cv-01135 RB-RLP

UNITED STATES DEPARTMENT
OF THE INTERIOR, et al.,

       Defendants.


## MEMORANDUM  OPINION AND ORDER

This matter came before the Court on the Federal Defendant's Motion to Dismiss for Lack of Constitutional Standing and Ripeness (Doc. 18), filed April 30, 2009.  Having fully considered the parties' memoranda and the arguments for and against, the Court hereby GRANTS Defendants' motion to dismiss as Plaintiff has failed to demonstrate a legal right entitling it to mine potash in Section 17 or the surrounding areas, and Plaintiff's alleged future economic injuries are therefore speculative and cannot be redressed by a favorable decision of this Court.

## I.      INTRODUCTION AND PROCEDURAL BACKGROUND

This suit arose out of a recent decision by the Interior Board of Land Appeals (IBLA) of the United States Department of the Interior affirming a decision by the State Director of the New Mexico State Office of the Bureau of Land Management (BLM) to approve eleven separate applications submitted by Yates Petroleum Corporation (Yates) for permits to drill oil and gas wells (the Caper Wells) within Section 17 of the Potash Area of Southeastern New Mexico. *See*

*Intrepid Potash–New Mexico, LLC*, 176 I.B.L.A. 110 (Sept. 29, 2008) [hereinafter IBLA Decision].  Plaintiff Intrepid Potash–New Mexico, LLC (Intrepid) seeks judicial review of the IBLA Decision under the Administrative Procedure Act (APA) as arbitrary, capricious, an abuse of discretion, not in accordance with law, and not supported by substantial evidence.

Plaintiff filed a complaint in the U.S. District Court for the District of Columbia on December 22, 2008 seeking judicial review of the IBLA Decision and requesting an order enjoining the Federal Defendants (the Department of the Interior, the Secretary of the Interior, and the BLM) from permitting the drilling of the Caper Wells.  On March 16, 2009, Yates filed a Motion to Intervene and a Motion to Transfer Venue to the District of New Mexico. (Doc. 10.) The Federal Defendants then filed a Motion to Dismiss for Lack of Constitutional Standing and Ripeness (Doc. 18) with the U.S. District Court for the District of Columbia on May 30, 2009. Intervenor Defendant Yates filed a Joinder and Supplemental Points and Authorities in Support of Federal Defendants' Motion (Doc. 20) on May 20, 2009.  Intrepid filed a Response (Doc. 22) on June 15, 2009.  The Federal Defendants filed a Reply (Doc. 24) on July 25, 2009.  Venue was then transferred to the District of New Mexico (Doc. 25) on November 18, 2009.

As this case was originally filed in the U.S. District Court for the District of Columbia, the parties' memoranda on Defendants' motion to dismiss primarily addressed D.C. Circuit case law.  Therefore, by a letter dated March 26, 2010, the Court requested supplemental briefing on two issues: (1) To what extent should this Court consider Tenth Circuit versus D.C. Circuit case law in reaching a decision on Defendants' Motion to Dismiss and (2) What impact should the Tenth Circuit cases *Mount Evans Co. v. Madigan*, 14 F.3d 1444 (10th Cir. 1994) and *Ash Creek Mining Co. v. Lujan*, 969 F.2d 868 (10th Cir. 1992) have on the standing issue, specifically

redressability?  The parties provided the Court with simultaneous submissions on April 16, 2010.

(Docs. 49, 50, and 51.)

## II.    STATEMENT OF FACTS

Potash, also known as potassium chloride, is a relatively rare mineral (the U.S. imports approximately 80% of its potash) and a key component in the production of plant fertilizer. There are only about twenty-five commercial deposits of potash in the world, and Southeastern New Mexico happens to be home to one of these deposits, the majority of which underlies federal lands.  In 1939, the Secretary of the U.S. Department of the Interior issued an  order designating a special "Potash Area" in Southeastern New Mexico "[f]or the purpose of protecting and conserving the potash deposits belonging to the United States." 4 Fed. Reg. 1012 (Feb. 6, 1939).  Since 1939, the Secretary has issued four other orders detailing rules and policy for the Potash Area.  Most recently, the Secretary issued the 1986 Order, which established new rules for "concurrent operations in prospecting for, development and production of oil and gas and potash deposits" on federal lands. 51 Fed. Reg. 39425 (Oct. 28, 1986), *corrected by* 52 Fed. Reg. 32171 (Aug. 26, 1987).

In addition to potash, Southeastern New Mexico has also been blessed with abundant resources of natural gas and oil.  This has created tension between the oil & gas and potash industries that operate concurrently in the Potash Area.  Plaintiff Intrepid Potash contends that one of the greatest risks to potash deposits in Southeastern New Mexico is "waste caused by improperly sequenced oil and gas drilling." (Compl. ¶ 2.)  If oil or gas wells are drilled before the potash is mined, there is the risk that oil, water, or gas could leak into the potash deposits and contaminate them.   Additionally, if oil and gas exploitation and potash mining occur concurrently, there is a risk that natural gas will leak into the potash mines and explode, harming

the underground miners.  Potash miners must therefore leave a quarter to half mile safety buffer around all wells, resulting in the waste of substantial quantities of potash deposits if oil and gas wells are drilled before the potash has been removed.

There are currently about 2,700 oil and gas wells within the Potash Area.  Plaintiff argues that the BLM has failed to "timely and accurately map the Potash Area using the most current technology," and that this has led to the drilling of additional wells and the waste of substantial potash reserves. (Compl. ¶¶ 3–4.)  Intervenor Defendant Yates is one of the companies that lease federal lands within the Potash Area for oil and gas production.  Recently, Yates applied for permits to drill eleven oil and gas wells within Section 17 of the Potash Area, which is near Plaintiff's East Mine.  These wells were approved by the BLM in August 2006.  This decision was appealed by Plaintiff, first to the State Director of the New Mexico State Office of the BLM, and then to the IBLA.

Plaintiff now seeks judicial review of the IBLA Decision in this Court.  First, Plaintiff argues that the IBLA Decision should be vacated as contrary to the 1986 Order, which was issued in accordance with the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq.*, and the Mineral Leasing Act for Acquired Land of 1947, 43 U.S.C. §§ 351–359. (Compl. ¶¶ 123–36.) Second, Plaintiff argues that the IBLA Decision violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370f, by affirming an environmental assessment that does not adequately discuss appropriate alternatives to the drilling of the proposed oil and gas wells. (Compl. ¶¶ 137–47.)  And third, Plaintiff argues that the IBLA Decision violated the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701–1785, by approving oil and gas wells without properly considering whether the approval complied with applicable land use plans, specifically the Carlsbad Resource Area Amended RMP, which requires the BLM's

4

approval of new oil and gas wells to comply with the 1986 Order. (Compl. ¶¶ 148–52.)  Plaintiff argues that the IBLA Decision did not comport with these legal requirements, and therefore, it was arbitrary, capricious, an abuse of discretion, not in accordance with the law, and not supported by substantial evidence on the record under the APA, 5 U.S.C. §§ 701–706.

One of the key policies established by the 1986 Order was the *enclave policy*: "It is the policy of the Department of the Interior to deny approval of most applications for permits to drill oil and gas test wells from surface locations within the potash enclaves . . . ." Section III(E)(1). The 1986 Order defines a potash enclave as an area "considered to contain a mineable reserve [of potash] in one or more ore zones, i.e., those areas (enclaves) where potash ore is known to exist in sufficient thickness and quality to be mineable under existing technology and economics." Section III(D)(1)(c).  These potash enclaves are to be delineated and revised annually by the BLM, which shall review information submitted by the potash lessees and make revisions to the potash enclave boundaries, committing its findings to maps "as necessary to reflect the latest available information." Section III(D)(1)(d).

Since 1975, the BLM has applied what is called the Van Sickle Standard to determine enclave boundaries and revise its maps of the Potash Area.  The Van Sickle Standard was developed in a 1974 memorandum by Donald M. Van Sickle, the Area Geologist for the U.S. Geological Survey at that time.  The Standard requires the drilling of core holes or the collection of mine face samples[1] and then applies a numerical formula to analyze the ore quality and a "data sufficiency guideline" of a minimum of three core holes no more than 1.5 miles apart to determine the extent of the deposit:

---

1.  A core hole is a vertical column of subsurface strata that is extracted and then chemically analyzed to determine the presence or absence of potassium mineral content.  A mine face sample is a vertical column of subsurface strata that is collected from the face of a mine and then analyzed.

5

<u>Mineable</u> - Potash ore of minimum quality and thickness greater than 4' of 10% $K_2O$/Sylvite or 4' of 4% $K_2O$/Langbeinite or equivalent combinations of the two:

    1.   <u>Measured Mineable Reserves (Potash Enclave)</u>.

        a.   Measured ore will be delineated by data points no more than 1½ miles apart if geologic inference shows these projections to be reasonable.

        b.   Measured ore will not be delineated by less than 3 data points that meet all other distance and thickness and grade criteria.

        c.   Measured ore will not be projected further than ½ mile from a data point which meets thickness and quality standards where no projection or geologic inference data exists.

    2.   <u>Indicated Reserves</u>

That area where spacing of data points does not meet measured Ore Criteria; yet data points show mineralization higher than minimum thickness and quality.

Van Sickle Memorandum, Geological Survey, Drawer 1857, Roswell, NM 88201 (Apr. 5, 1974).

Intrepid has been leasing lands in the Potash Area since 2004 and has invested millions of dollars in mining and processing equipment. Intrepid is now interested in expanding its potash mining operations into Section 17 where Yates' Caper Wells are to be drilled. Intrepid argues that expanding its operations into Section 17 (and other adjacent sections) would provide the necessary incremental return on its investments, and that it has been injured because its expected return on these investments has been diminished by the IBLA Decision, which will preclude any future potash mining in most of Section 17. Additionally, Intrepid argues that it has been injured because the approval of the Caper Wells has interfered with the immediate trajectory of its mining operations and shortened the overall life of its East Mine, asserting that Section 17 and the surrounding sections form part of what would be a logical expansion of its East Mine. In furtherance of this planned expansion, Intrepid filed an application in September 2006 to drill an exploratory core hole in Section 17 to confirm the presence of potash. This

application was approved by the BLM in April 2008, and in May 2008, a core hole confirmed the presence of potash in Section 17.

Based on this core hole and its gamma ray log data,[2] Plaintiff believes Section 17 should have been designated a potash enclave by the BLM and complains that the "wells, if drilled, would immediately exclude from foreseeable development substantial mineable potash that Intrepid has scrupulously studied, mapped, and analyzed for over three years and proposes to mine." (Doc. 22, p. 1.)  Plaintiff argues that the IBLA Decision is contrary to the 1986 Order and unlawfully grants Yates final permits to drill in a valuable potash enclave and on lands which are "vital to Intrepid's business interests." (Doc. 22, p. 2.)  Plaintiff further contends that the IBLA Decision provides final approval and fully authorizes the drilling of the wells, causing Plaintiff "imminent injuries." (Doc. 22, p. 2.)

Plaintiff asserts that these injuries would be redressed if the IBLA Decision approving the oil and gas drilling permits was vacated.  Specifically, Plaintiff requests that this Court:

1. Hold unlawful and set aside the IBLA Decision as arbitrary and capricious, an abuse of discretion, not in accordance with law, and not supported by substantial evidence;
2. Declare the IBLA Decision violates the 1986 Order, NEPA, and FLPMA;
3. Remand the IBLA Decision with instructions that the IBLA vacate and hold unlawful the BLM's environmental assessment, decision records, FONSIs, and approval of the permits to drill the Caper Wells;
4. Enjoin Federal Defendants from authorizing or allowing the drilling of the Caper Wells pending compliance with the 1986 Order, NEPA, and FLPMA;
5. Award Intrepid its reasonable costs and attorneys fees; and
6. Grant Intrepid such other and further relief as the Court deems just and proper, including, if necessary, preliminary injunctive relief.

---

2. Gamma ray logs, geophysical logs, electronic logs, or e-logs are obtained by lowering a sensing device into an existing oil and gas well bore or other hole and measuring the properties of the surrounding subsurface strata. Plaintiff argues that this provides a reliable, additional source of information regarding potash enclaves and in some cases can actually replace the need to obtain physical core or mine face samples.

(Compl. ¶¶ 40–41.)

Defendants seek to dismiss Plaintiff's complaint under Federal Rule of Civil Procedure 12(b)(1) because Plaintiff has failed to establish constitutional standing or ripeness. Defendants argue that Plaintiff does not have standing because its alleged injuries are neither "certain, imminent, or inevitable": (1) Plaintiff has not obtained or requested a potash lease for Section 17; (2) even if Plaintiff were to request a lease, there would be other competitors, and it is not guaranteed that the BLM would grant Intrepid a lease; (3) even if Plaintiff were to receive a lease, it is not clear that the potash deposits on the land are of sufficient thickness and quality to be mineable or to designate the area a potash enclave; (4) even if Plaintiff obtains the leases and the land is designated a potash enclave, Yates could still drill for oil and gas under the two exceptions established by the 1986 Order; and (5) even if Plaintiff can show a concrete and particularized injury, it cannot prove that the harm alleged is likely to be redressed by a favorable decision of this Court. (Doc. 18, pp. 1–2, 25.) Thus, Defendants argue that due to the many BLM decisions and contingencies that must occur before Plaintiff can hope to have Section 17 designated a potash enclave and begin mining, Plaintiff's alleged future economic harm is so "speculative and problematic" that this Court lacks jurisdiction to hear the case under Article III of the United States Constitution. (Doc. 18, p. 2.)

## III.   STANDARD OF REVIEW

"A district court is not exclusively a trial court. In addition to its *nisi prius* functions, it must sometimes act as an appellate court. Reviews of agency action in the district courts must be processed *as appeals*." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994). "When acting as a court of appeal, it is improper for a district court to use methods and procedures designed for trial." *Id.* at 1564. Defendants have filed a Rule 12(b)(1) motion to

dismiss for lack of subject matter jurisdiction.  This Court may properly address Defendants'

Motion in its review of the IBLA Decision as "[j]urisdictional challenges can be made by any

party or the court at any time and are not subject to waiver or forfeiture." *Huerta v. Gonzales*,

443 F.3d 753, 755 (10th Cir. 2006) (citing *Steel Co. v. Citizens for a Better Environment*, 523

U.S. 83, 94–95 (1998)).

> Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is
> power to declare the law, and when it ceases to exist, the only function remaining
> to the court is that of announcing the fact and dismissing the cause.  On every writ
> of error or appeal, the first and fundamental question is that of jurisdiction . . . .
> This question the court is bound to ask and answer for itself, even when not
> otherwise suggested, and without respect to the relation of the parties to it.

*Citizens for a Better Environment*, 523 U.S. at 94–95 (internal citations and quotations omitted).

"Generally, Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction take

two forms." *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir.1995).  The first is a facial

attack on the complaint questioning the sufficiency of the factual allegations to support

jurisdiction.  *Id*.  The second type challenges the underlying jurisdictional facts alleged in the

complaint and upon which the plaintiff's standing is based.  *Id*.  Where the party contesting

jurisdiction mounts a facial attack on Plaintiff's complaint, the court "must accept as true all

material allegations of the complaint, and must construe the complaint in favor of the

complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see also Wyoming v. United

States*, 279 F.3d 1214, 1222 (10th Cir. 2002).  However, "[w]hen  reviewing a factual attack on

subject matter jurisdiction . . . [a] court has wide discretion to allow affidavits, other documents,

and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)."

*Holt*, 46 F.3d at 1003; *see also Warth*, 422 U.S. at 501.  "If, after this opportunity, the plaintiff's

standing does not adequately appear from all materials of record, the complaint must be dismissed." *Warth*, 422 U.S. at 501.

In the case at hand, Defendants attack some of the underlying jurisdictional facts alleged in the complaint.  Specifically, Defendants challenge Plaintiff's assertion that Section 17 contains mineable potash reserves, such that it should be declared a potash enclave and that Plaintiff can claim an injury in fact and prove standing.  In order for this Court to have subject matter jurisdiction, a plaintiff must first demonstrate that it has Article III standing, which means there must be an actual case or controversy, and Plaintiff must have suffered a threatened or actual injury as a result of a defendant's allegedly unlawful actions. *Id*. at 498–99.  Defendants argue that Plaintiff could not have suffered a threatened or actual injury because the one core hole sample that Plaintiff submitted along with its gamma ray log data does not conclusively show that Section 17 contains mineable potash reserves.

> Even if plaintiff eventually obtains a federal lease, its alleged injuries would still be too speculative to be deemed "actual or imminent."  Plaintiff hints that BLM's application of the Van Sickle Standard harmed it because, if BLM had properly considered plaintiff's gamma ray or "geophysical log data," it would have deemed the particular Yates area potash economically mineable and, therefore, within a designated potash enclave.
> However, because plaintiff has submitted only one of the three core samples necessary for BLM to apply the Van Sickle Standard, BLM has not yet completed its application of that standard by either granting or denying plaintiff's requested potash enclave.

(Doc. 18, p. 22–23.)  In other words, Defendants argue that there can be no injury in fact, and therefore, no standing, because the only way to conclusively show that there are mineable potash deposits in Section 17 is through the Van Sickle Standard; and since the data Plaintiff submitted is inconclusive, it has failed to show an injury in fact.

Along with their memoranda, both parties submitted maps, affidavits, and other documents related to the contested issue of whether Section 17 should be declared a potash enclave.  Although a district court generally has wide discretion to consider such extraneous evidence to resolve jurisdictional issues, problems arise when a party attacks the facts underlying jurisdiction, and these facts are intertwined with the merits of the case. *See City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) ("in reviewing the standing question, the court must be careful not to decide the questions on the merits"); *Pringle v. United States*, 208 F.3d 1220, 1222–23 (10th Cir. 2000); *Holt*, 46 F.3d at 1003.  To determine whether the jurisdictional question is intertwined with the merits of the case, the Court must examine "whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim." *Pringle*, 208 F.3d at 1223; *see also Paper, Allied-Indus., Chem. and Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005).  In the case at hand, Defendants' attack on jurisdiction appears to be intertwined with the merits of the case, as resolution of whether Plaintiff's gamma ray log data and core holes conclusively demonstrate that Section 17 contains mineable potash deposits under the 1986 Order must be resolved in favor of Plaintiff to prove standing, and this same dispute is at the very center of Plaintiff's substantive claim.

The IBLA ruled that in approving the permits for the Caper Wells, the BLM did not violate the 1986 Order and did not ignore Plaintiff's gamma ray log data; instead, the BLM "determined that this proffered data was insufficient to establish the thickness and quality of potash ore 'known to exist' in sec. 17 and to identify an enclave in that section." 176 IBLA 118. Because Intrepid did not meet its burden to show that the BLM acted improperly, the IBLA found the approval of the drilling permits in accordance with the 1986 Order. 176 IBLA at 117. Plaintiff challenges the IBLA Decision, arguing that the 1986 Order required the BLM to

11

consider its gamma ray log data which conclusively demonstrates that Section 17 is a potash enclave, and asks the Court to find that the Decision was arbitrary, capricious, an abuse of discretion, not in accordance with the law, and not supported by substantial evidence. (Doc. 1, ¶ 126.)  If the Court were to decide that there was no injury in fact because Plaintiff's gamma ray log data and core hole do not conclusively demonstrate the presence of mineable potash in Section 17 and dismiss for lack of standing, it would essentially be affirming the IBLA Decision on the merits.

"[A] court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case." *Holt*, 46 F.3d at 1003.  In the case at hand, however, converting Defendants' Rule 12(b)(1) motion into a motion for summary judgment would be inappropriate, as the Court is acting as an appellate court reviewing agency action, and motions for summary judgment "are conceptually incompatible with the very nature and purpose of an appeal." *Olenhouse*, 42 F.3d at 1580; *see also Hamilton v. Secretary of Healty and Human Services*, 961 F.2d 1495, 1503 (10th Cir. 1992) (disapproving of summary judgment "because the procedure permits parties to support their position by affidavits, depositions, and other supplemental materials going beyond the administrative record by which the district court is statutorily bound. . . .  If additional evidence is to be considered, it must be by way of remand.").

Since the only part of Defendants' Rule 12(b)(1) motion that goes to the merits is its argument that Section 17 should not be designated a potash enclave, the Court will address that issue as a Rule 12(b)(1) facial attack on jurisdiction, excluding the supplemental documents submitted by the parties, but consider Defendants' other standing and ripeness arguments as an attack on the underlying jurisdictional facts alleged in the complaint and consider those

12

documents submitted by the parties relevant to resolving any disputed jurisdictional facts. If the parties were permitted to supplement the administrative record, they would essentially be relitigating their factual disputes before this Court. *See Camp v. Pitts*, 411 U.S. 138, 142–43 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"); *Kane County Utah v. Salazar*, 562 F.3d 1077, 1086 n. 3 (10th Cir. 2009); *Olenhouse*, 42 F.3d at 1580 (finding that a court cannot rely on "*post hoc* rationalizations" or supplement the agency record); *Webb v. Hodel*, 878 F.2d 1252, 1254 (10th Cir. 1989). In *Olenhouse*, the Tenth Circuit prohibited "a district court's 'reliance on arguments, documents and other evidence outside the administrative record,' as well as, relatedly, the treatment of an APA-based claim 'as a separate and independent action, initiated by a complaint and subjected to discovery and a pretrial motions practice.'" *Salazar*, 562 F.3d at 1086 n. 3.

Consequently, in considering the issue of injury in fact and whether Section 17 should be considered a potash enclave, the Court will not consider those supplemental documents submitted by the parties, but instead, will only review the sufficiency of the factual allegations in the complaint to support jurisdiction. For example, many of the maps, affidavits, and reports submitted by Plaintiff with its Response were clearly dated 2009, after the IBLA entered its Decision on September 29, 2008. The Court may however consider those documents that go only to the jurisdictional issue or that were specifically referenced in the complaint and whose authenticity is not disputed by the parties. *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) (finding that on a motion to dismiss the Court "may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do

not dispute the documents' authenticity").  For example, on numerous occasions, the complaint

refers to the Van Sickle Memorandum and the 1986 Order.

## IV.    ANALYSIS

As courts of limited jurisdiction, federal courts may only adjudicate those cases that the

U.S. Constitution and Congress have granted them authority to hear.  *See* U.S. CONST. Art. III;

*Morris v. City of Hobart*, 39 F.3d 1105, 1110 (10th Cir.1994).  Additionally, "[b]ecause the

jurisdiction of federal courts is limited, there is a presumption against our jurisdiction, and the

party invoking federal jurisdiction bears the burden of proof." *Marcus v. Kansas Dept. of

Revenue*, 170 F.3d 1305, 1309 (10th Cir.1999) (internal quotations omitted); *see also Lujan v.

Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  For a federal court to have subject matter

jurisdiction, there are two constitutional requirements: there must be standing and the case must

be ripe. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n. 8 (2007).  "Without such

limitations . . . the courts would be called upon to decide abstract questions of wide public

significance even though other governmental institutions may be more competent to address the

questions and even though judicial intervention may be unnecessary to protect individual rights."

*Warth*, 422 U.S. at 500.  Defendant argues that the case at hand is non-justiciable because

Plaintiff lacks standing and because the case is not yet ripe.

There  are  three  essential  elements  to  constitutional  standing:  (1)  injury  in  fact,

(2) causation, and (3) redressability. *Citizens for a Better Envt.*, 523 U.S. at 103; *Defenders of

Wildlife*, 504 U.S. at 560–61; *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1241 (10th

Cir. 2008).  "Injury in fact reflects the statutory requirement that a person be adversely affected

or aggrieved, and it serves to distinguish a person with a direct stake in the outcome of a

litigation—even though small—from a person with a mere interest in the problem." *United*

*States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 690 n. 14 (1973).

"A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered some threatened or actual injury resulting from the putatively illegal action." *Warth*, 422 U.S. at 499 (internal quotations omitted). Thus, in the case at hand, Plaintiff must demonstrate that it was personally injured by the BLM's and IBLA's alleged unlawful actions, not merely that these actions negatively impacted the United States' limited potash reserves. *Id.* at 500. Even if the IBLA Decision was unlawful and contrary to the 1986 Order, NEPA, and FLPMA, if Plaintiff cannot show that it was personally injured, the case is non-justiciable.

For Plaintiff to have suffered a personal injury, there must have been "an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *Defenders of Wildlife*, 504 U.S. at 560 (internal quotations and citations omitted). The specific injury complained of by Intrepid is that the IBLA Decision approving the Caper Wells disrupted Plaintiff's planned expansion of its East Mine, and as a result, it will not receive the anticipated return on its investment in equipment upgrades and exploration. Thus, Plaintiff claims that it has suffered a likely future economic injury because the IBLA Decision interfered with its ability to pursue an opportunity for economic benefit. Plaintiff argues that this injury resulted from the BLM's and then the IBLA's misapplication of the 1986 Order and its failure to consider all available data, including Plaintiff's gamma ray logs.

Defendants argue, however, that Plaintiff did not suffer an injury in fact because Section 17 does not qualify as a potash enclave, and the 1986 Order only restricts drilling within enclaves. Plaintiff counters that, even if it did not submit the three core samples as required by the BLM under the Van Sickle Standard, its gamma ray log data conclusively demonstrates that Section 17 is a potash enclave. Both parties submitted supplemental materials to support their

arguments.   As previously discussed, the issue of whether the available data conclusively demonstrates that Section 17 is a potash enclave is intertwined with the merits of the case; therefore, it is not appropriate for the Court to consider this supplemental evidence.   The Court thus excludes this supplemental evidence from consideration and will look only at the sufficiency of the factual allegations in the complaint to support jurisdiction.

Since 1975 the BLM has applied the Van Sickle Standard to identify potash enclaves. The 1986 Order, however, only requires the BLM to take the following steps in identifying potash enclaves:

> The authorized officer [of the BLM] shall review the information submitted [by potash lessees] in this regard and make any revisions in the boundaries or the proposed mineable reserves (potash enclaves) which are consistent with the data available at the time of such analysis.   The authorized officer shall commit the initial findings to a maps(s) of suitable scale and shall thereafter revise that map(s) as necessary to reflect the latest available information.

51 Fed. Reg. 39425 (Oct. 28, 1986).  The 1986 Order clearly does not require the BLM to apply any specific standard in determining potash enclave status, but only requires that the BLM update its maps using the information submitted by the potash lessees to ensure that the maps reflect the latest available information.

In its complaint, Plaintiff cites to a recent decision by the IBLA that found "the '1974 Van Sickle Standard was not shown to satisfy the requirements of the [1986] Order,' that 'BLM failed to identify potash enclaves properly and in the manner prescribed by the [1986] Order,' and that 'APD denials based upon the enclave policy must be remanded for BLM's proper identification of potash enclaves and subsequent application of the enclave policy . . . .'" (Compl. ¶ 36, quoting *IMC Kalium Carlsbad, Inc.*, 170 IBLA 25, 39–40 (2006).)  Plaintiff thus complains that the BLM is using an incorrect standard for determining potash enclave status in

16

violation of the 1986 Order. (Compl. ¶ 75.)  Plaintiff further alleges that it provided the BLM with "geophysical log data [that] showed extensive potash enclaves in Section 17 and adjacent sections, that BLM [] refused to consider such data in mapping Section 17, and that approving the Caper APDs Nos. 6–16 would permanently waste enormous amounts of valuable potash." (Compl. ¶ 52.)  Consequently, Plaintiff asserts that the "IBLA's finding that Intrepid did not meet its burden of showing that Section 17 constitutes enclave [sic] is not supported by substantial evidence." (Compl. ¶ 76.)  Having reviewed the complaint, the Court finds that Plaintiff alleged sufficient facts indicating that Section 17 should be considered a potash enclave for purposes of this motion to dismiss. *See Holt*, 46 F.3d at 1002.

Defendants next argue that without a potash lease for Section 17, Plaintiff has no legally protected interest, and therefore, no standing, as its interest in any alleged potash deposits are purely speculative at this point and may or may not vest in the future.  Without a lease or some other legal right to mine the potash deposits in Section 17, Defendants argue that the BLM could exercise its discretion not to issue a potash lease for Section 17, or, another mining company could obtain a lease in lieu of Plaintiff, and therefore, Plaintiff's alleged injuries are purely conjectural. *See O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("The injury or threat of injury must be both real and immediate, not conjectural or hypothetical." (internal quotations omitted); *Glover River Org. v. U.S. Dept. of the Interior*, 675 F.2d 251, 254 (10th Cir. 1982) ("abstract injury is not enough to confer standing").

While Plaintiff does not currently hold a potash lease for Section 17, Intrepid did apply for an exploration license in September 2006, which was granted in May 2008.  This license (Doc. 20-3) grants Plaintiff the right to drill core holes in Section 17 to search for mineable

potash reserves, but not the right to mine potash.[3]   The IBLA found that this license was sufficient to grant Intrepid standing before the agency, as it "represent[ed] a legally cognizable interest in the lands in question that it has shown is substantially likely to be injured by BLM's decision to approve oil and gas drilling." (Compl. ¶ 67.)   The IBLA's determination of standing, however, is distinct from this Court's determination of standing.   As part of the executive branch, administrative agencies are not bound by Art. III. *See Kelly v. Selin*, 42 F.3d 1501, 1508 (6th Cir. 1995); *Koniag, Inc. v. Andrus*, 580 F.2d 601, 612 (D.C. Cir. 1978).   Instead, standing before the IBLA is determined by federal regulation. *See* 43 C.F.R. § 4.410(b) & (d).   Therefore, this Court must make its own, independent determination of standing.

Courts may find injury in fact where a plaintiff has suffered the loss of an opportunity to obtain some plausible economic benefit. *See Wyoming v. Lujan*, 969 F.2d 877, 881 (10th Cir. 1992).   Consequently, the fact that Plaintiff does not yet have a potash lease may not necessarily preclude a finding of injury in fact. *See Sierra Club v. Morton*, 405 U.S. 727, 732 (1972); *Assoc. of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 154 (1970) ("Certainly he who is 'likely to be financially' injured . . . may be a reliable private attorney general to litigate the issues of the public interest . . . ."); *Mountain States Legal Found., et al., v. Glickman*, 92 F.3d 1228, 1233 (D.C. Cir. 1996) ("plaintiffs may not have any particular right to federal timber contracts, but no 'right' is required any more than a 'right' to view crocodiles in foreign sites was necessary for

---

3. Some BLM exploration licenses for federal lands give the prospector a preferential right to lease the area covered by the exploration permit in order to encourage exploration for natural resources. *See Utah Int'l, Inc. v. Andrus*, 488 F.Supp. 976, 984 (D. Colo. 1980).   Defendants argue that this is not true in the case at hand.   However, Title 30 (Mineral Lands and Mining), Chapter 3A (Leases and Prospecting Permits), Subchapter IX (Potash), Section 282 of the United States Code provides that "[u]pon showing to the satisfaction of the Secretary of the Interior that valuable deposits of one of the substances enumerated in this subchapter has been discovered by the permittee within the area covered by his permit, and that such land is chiefly valuable therefore, the permittee shall be entitled to a lease for any or all of the land embraced in the prospecting permit . . . ." 30 U.S.C. § 282.   Still, it does not appear that Plaintiff is currently entitled to a potash lease for Section 17 because, under the statute, Intrepid must first show that there are valuable deposits of potash to the satisfaction of the Secretary of the Interior.   Neither Plaintiff nor Defendant addressed this statute or its potential application to the case at hand in their memoranda.

the plaintiffs in [*Lujan v. Defenders of Wildlife*]").   The fact that Plaintiff invested substantial sums of money in equipment, exploration, and lease applications bolsters its argument that it has suffered a particularized, imminent, and concrete injury.   Once the oil and gas wells have been drilled, Plaintiff asserts that the bulk of any potash deposits in these sections will be permanently damaged or destroyed, and Plaintiff will have forever lost the opportunity to mine these areas.

"In *Watt v. Energy Action Educ. Found.*, 454 U.S. 151 . . . (1981), for example, the U.S. Supreme Court concluded that the State of California had standing to challenge the Secretary of the Interior's failure to comply with a statute requiring it to experiment with different royalty systems for the leasing of offshore gas and oil production rights." *Wyoming v. Lujan*, 969 F.2d at 881.   The Court found that, although the requirement to experiment with different royalty systems did not guarantee the state any revenues, the failure of the Secretary to comply with the statute resulted in a loss of opportunity for the state to earn revenues and constituted an injury in fact. *Watt*, 454 U.S. at 160–62.   In the case at hand, Plaintiff claims that the IBLA's failure to follow the 1986 Order, NEPA, and FLPMA resulted in the unlawful approval of the oil and gas wells and a loss of an economic opportunity for Intrepid.   As a result, Plaintiff asserts that the company suffered an injury in fact, even though the alleged benefit was never a certainty, but contingent upon Intrepid obtaining a lease from the BLM. *See CC Distributors, Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989) ("a plaintiff suffers a constitutionally cognizable injury by loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* the benefit had it been accorded the lost opportunity").

Citing to the D.C. Circuit case *Mountain States*, 92 F.3d at 1233, Plaintiff further argues that no lease is necessary to show an injury in fact because the approval of the Caper Wells

caused its supply of potash to be constricted. In *Mountain States*, the court found that "[g]overnment acts constricting a firm's supply of its main raw material clearly inflict the constitutionally necessary injury" to satisfy standing. *Id*. In the case at hand, however, Plaintiff has not shown that its supply of potash is being constricted in the same way as the logging company in *Mountain States*. Plaintiff argues that moving its current operations into Sections 7, 17, 18, 19, and 20 presents the most logical and most profitable route of expansion for its East Mine, but Plaintiff has not demonstrated that there are no other mineable potash deposits in the area. Thus, while Plaintiff may view this as the best route of expansion, it is not at all clear that the approval of the Caper Wells has constricted Intrepid's supply of potash.

In *Mountain States*, the U.S. Forest Service limited timber harvesting in the Kootenai National Forest in Montana—an area in which the plaintiff had historically harvested one third of its lumber—and during a past logging moratorium, the plaintiff had been forced to temporarily shut down its mill and lay off workers. *Id*. at 1232. In the case at hand, Plaintiff has not claimed that it will be forced to shut down its mining or processing operations, or that it will be precluded from conducting potash mining activities elsewhere within the Potash Area. Instead, Plaintiff claims that the IBLA Decision will impact its planned expansion and reduce its profitability. This injury is distinct, however, from having its supply constricted.

In the final analysis, whether Plaintiff suffered an injury in fact is contingent upon the likelihood of Plaintiff's alleged future economic injury. An alleged future economic injury cannot be entirely hypothetical, but must be fairly certain, concrete, and imminent. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *O'Shea*, 414 U.S. at 494; *United Public Workers of America v. Mitchell*, 330 U.S. 75, 90 (1947); *PNGTS Shippers' Group v. Fed. Energy Regulatory Comm'n*, 592 F.3d 132, 137 (D.C. Cir. 2010) ("The potential for future economic

injury . . . is not enough to show the requisite injury for Article III standing." (internal quotations omitted)).  In the case at hand, Plaintiff's alleged future economic injury hinges on the likelihood of the BLM granting Intrepid a competitive or non-competitive potash lease.  Two years ago, Plaintiff applied for a non-competitive lease (Doc. 22-13) for Sections 7, 18, 19, and 20, and argues that the approval of this lease is imminent.  Under a non-competitive lease, a lessee does not have to compete with other lessees, and the new sections are treated as a lease modification and incorporated into an existing lease. *See* 43 C.F.R. § 3510.

Defendants argue, however, that the decision of whether or not to grant a potash lease is within the sole discretion of the BLM; and, as there is no guarantee that Section 17 or the surrounding sections will be offered for lease by the BLM, or that, if they are offered for lease, Intrepid would be the highest bidder, Plaintiff's injuries are entirely conjectural.  Plaintiff counters, however, that under the 1986 Order, the BLM does not have unlimited discretion to grant or deny potash leases.  While Plaintiff is correct that the 1986 Order limits the approval of oil and gas leases within potash enclaves, it says nothing about the discretion of the BLM in issuing potash leases; it advances a policy of limiting the undue waste of potash deposits, but conveys no policy regarding the issuance of leases.  Indeed, the BLM might conceivably determine that restricting all potash leases until some time in the future would limit undue waste.  As Plaintiff has cited to no persuasive, contrary authority, the Court finds that the issuance of potash leases by the BLM is discretionary.[4]

---

4. The Tenth Circuit has stated that "[t]he federal courts do not have the power to order competitive leasing.  By law, that *discretion* is vested absolutely in the federal government's executive branch and not in its judiciary." *Wyoming v. Lujan*, 969 F.2d at 882 (emphasis added).  Additionally, this Court's independent search of the relevant statutes indicates that Congress intended the BLM to have discretion in the issuance of mineral leases on public lands.  Under Title 30 (Mineral Lands and Mining), Chapter 3A (Leases and Prospecting Permits), Section 274 (Lands Containing Coal or Other Minerals) of the United States Code, "[p]rospecting permits or leases may be issued in the *discretion* of the Secretary of the Interior . . . ." 30 U.S.C. § 274 (emphasis added).

While it appears that Plaintiff has expended considerable sums of money on exploration and mining equipment in anticipation of expanding its East Mine into Section 17 and the surrounding areas, this does not mean that Plaintiff has suffered an injury in fact.  Under Article III, a plaintiff must do more than present an abstract hope or unilateral expectation of some future economic benefit, but must demonstrate that he "is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Lyons*, 461 U.S. at 101–02 (internal citations omitted)).   Thus, even accepting as true all Plaintiff's allegations with regard to the enclave status of Section 17 and Plaintiff's submissions indicating that Intrepid applied for exploration permits and leases and expended substantial sums of money in anticipation of expanding its mining activities, Plaintiff still has not demonstrated that it has a legal right to mine potash in Section 17 or that the BLM is in any way obligated to grant Intrepid, or any mining company, a potash lease.  Consequently, the Court finds that Plaintiff's alleged economic injuries are too conjectural to constitute an injury in fact.

In addition to its alleged economic injuries, Plaintiff claims that it has suffered procedural injuries, arguing that because the BLM's environmental assessment did not adequately discuss and consider appropriate alternatives to the proposed drilling, the IBLA Decision approving the wells violated Section 102(2)(E) of the NEPA. (Compl. ¶ 139.)  To establish constitutional standing to enforce procedural rights, the procedures in question must be "designed to protect some threatened concrete interest of [the plaintiff's] that is the ultimate basis of the standing." *Defenders of Wildlife*, 555 U.S. at 573 n. 8.  Furthermore, because NEPA does not provide for a private right of action, "in addition to satisfying the constitutional standing requirements, a plaintiff must establish it is 'adversely affected or aggrieved . . . within

the meaning of the relevant statute' by some final agency action." *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448 (10th Cir.1996).

The primary environmental harm that Plaintiff asserts will result from the BLM's alleged failure to follow proper NEPA procedures is that the drilling will negatively affect the potash resources of the area. (Compl. ¶¶ 137–45.)  Thus, it is not clear that Plaintiff has identified a "concrete, particularized interest" that "flows from the agency's procedural failure" because Plaintiff has no legal interest in the potash resources of Section 17, and therefore, its interest in protecting these resources is generalized. *Comm. to Save the Rio Hondo*, 102 F.3d at 449. Additionally, Plaintiff has not established that it is within the "zone of interests" protected by the statute. *Id*. at 448 (finding that plaintiffs "must establish they have suffered an injury in fact falling within the 'zone of interests' protected by [NEPA]").  NEPA was designed to protect the Nation's natural resources and prevent environmental harms that would interfere with the "recreational use and aesthetic enjoyment" of the land; however, it is not clear that it was intended to preserve land from one form of environmental exploitation so that it may later succumb to another form of environmental exploitation. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990).  Plaintiff has produced no evidence indicating that it has suffered a particularized injury or that the IBLA has interfered with its recreational use and aesthetic enjoyment of the land; therefore, the Court finds that Plaintiff has failed to establish a procedural injury under NEPA.

In order to have standing, Plaintiff must also demonstrate that its injury is "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984); *see also Duke Power Co. v. Carolina Envt'l Study Group, Inc.*, 438 U.S. 59, 75 n. 29 (1978).  Plaintiff argues that if the

Court sets aside the IBLA Decision and remands, this will redress its injuries, halting the drilling of the wells and the consequent waste of millions of tons of potash, and allowing Intrepid to continue its planned expansion.  Defendants counter that Intrepid's injuries are not redressable by a favorable decision of this Court because, even if the Court were to find that the IBLA Decision was not in accord with the 1986 Order and remand the case, there is no assurance that Plaintiff will ever be granted a potash lease.

In the Tenth Circuit case, *Ash Creek Mining Co. v. Lujan*, a coal mining company opposed the Secretary of the Interior's exchange of federally owned coal located in Wyoming for a conservation easement on Laurance S. Rockefeller's JY Ranch located in Grand Teton National Park, Wyoming. 969 F.2d at 870.  "Ash Creek [the mining company] opposed the exchange primarily because it wanted to acquire the rights to the coal through the Secretary's competitive coal leasing program." *Id*. at 871.  In its complaint, Ash Creek alleged the following injuries, which are markedly similar to the case at hand:

> It is necessary to acquire the federal coal to maintain the viability of PSO No. 1 Mine. It is necessary to acquire the federal coal to *expand the existing mine* and fulfill the original purpose to serve the operating utilities of the Central and South West System.  It is necessary to expand onto the federal coal so as to *earn a return on the original investment* in the PSO No. 1 Mine and the adjoining acreage.

*Id*. (emphasis added).  Ash Creek then alleged that the exchange violated FLPMA, NEPA and the APA, and defendants filed a motion to dismiss. *Id*. at 872.  The district court granted the motion finding that "Ash Creek did not satisfy the requirements for constitutional standing because its alleged injury could not be redressed by voiding the exchange." *Id*.  Affirming the district court's decision, the Tenth Circuit held that "the loss of the possibility of leasing the

federal coal" is "not redressable by a favorable decision," and therefore, Ash Creek "lacked Article III standing." *Id*. at 874 (citing *Glover River*, 675 F.2d at 253—54).

In a similar case just two years later, the Tenth Circuit again held that a company's "injuries are not redressable by a favorable decision" where there was no guarantee that the company will be awarded a federal contract. *Mount Evans*, 14 F.3d at 1451.  In *Mount Evans*, the U.S. Forest Service owned the Crest House which was located at the summit of Mount Evans and provided food, souvenir sales, and other services to the visiting public. *Id*. at 1448. Although the Crest House was owned by the Forest Service, it was operated by a private company. *Id*.  When the House was destroyed by fire, the Forest Service decided not to rebuild. *Id*.  Various plaintiffs, including the company that operated the Crest House brought suit to challenge the Forest Service's decision under the APA. *Id*.  The Tenth Circuit concluded that the company's "injuries [were] not redressable because even if [it were] successful in obtaining the relief it [sought] and the Crest House was rebuilt, there [was] no guarantee that [the company] would be awarded the concession contract, and there [was] no way [the] court or any other court could order the Forest Service to award [the company] that contract." *Id*. at 1451.

*Ash Creek* and *Mount Evans* show the Tenth Circuit's reluctance to find standing when a plaintiff's alleged future economic injury is based upon a speculative property interest whose vesting is entirely contingent upon the discretionary functions of a federal agency.  The Supreme Court has additionally stated that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Defenders of Wildlife*, 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 38, 43).  And, it has required "a showing that there is a 'substantial likelihood' that the relief requested will redress the injury claimed." *Duke Power Co.*, 438 U.S. 59, 75 n. 20 (1978).  Thus, the mere "loss of the possibility of obtaining a federal lease is not

25

redressable by a favorable decision" of this Court. *Mount Evans*, 14 F.3d at 1451 (citing *Ash Creek*, 969 F.2d at 874).  Until a lease is actually granted, the granting of a lease will always be speculative, and a favorable ruling will not redress the alleged injury because, by law, the power to grant such leases is vested entirely with the executive. *Wyoming v. Lujan*, 969 F.2d at 882. While Plaintiff alleges that the granting of its lease application for Sections 7, 18, 19, and 20 is imminent, it has cited to no document, law, regulation, or other authority indicating this is the case.

## V.    CONCLUSION

As "the party invoking federal jurisdiction," Plaintiff "bears the burden of proof" to demonstrate standing. *Marcus*, 170 F.3d at 1309.  Having reviewed Plaintiff's complaint and the parties' memoranda and submissions in this matter, the Court finds that "the plaintiff's standing does not adequately appear from all materials of record, [and] the complaint must be dismissed." *Warth*, 422 U.S. at 501.  Plaintiff has failed to demonstrate a legal right entitling it to mine potash in Section 17 or the surrounding sections; and therefore, the Court finds that Plaintiff's alleged future economic injuries are speculative and cannot be redressed by a favorable decision of this Court.

**WHEREFORE**, the Court hereby GRANTS Defendants' Motion to Dismiss.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**